UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LOU ELLEN BERNER, | § | |
| | § | |
| Plaintiff, | § | |
| vs. | § | CIVIL ACTION NO. H-08-2729 |
| | § | |
| BUTLER & BINION GROUP LONG TERM | § | |
| DISABILITY INSURANCE GROUP | § | |
| INSURANCE PLAN, *et al*, | § | |
| | § | |
| Defendants. | § | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

I.    **INTRODUCTION**

The plaintiff, Lou Ellen Berner ("Berner"), commenced the instant action against the

defendants, Butler & Binion Group Long Term Disability Insurance Group Insurance Plan (the

"Plan") and The Guardian Life Insurance Company of America (collectively referred to as

"Guardian") pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29

U.S.C. § § 1132 (a)(1)(B)[1] and 1133, after the long-term disability benefits that she had received

for over ten years were terminated.

Pending before the Court are Guardian's motion for summary judgment (Docket Entry

No. 13), Berner's motion to strike Guardian's summary judgment evidence (Docket Entry No.

15), Berner's reply to Guardian's motion for summary judgment (Docket Entry No. 16),

Guardian's response in opposition to Berner's motion to strike (Docket Entry No. 17) and

Berner's sur-reply to Guardian's response to her motion to strike (Docket Entry No. 23).  Also

before the Court are Berner's motion for partial summary judgment (Docket Entry No. 14),

---

[1] ERISA § 1132(a)(1)(B) provides that "[a] civil action may be brought by a participant or beneficiary to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).

Guardian's response in opposition to Berner's motion for summary judgment (Docket Entry No. 18), Berner's sur-reply to Guardian's response to her motion for summary judgment (Docket Entry No. 24), and Guardian's sur-response to Berner's sur-reply (Docket Entry No. 31).  Having carefully considered the parties' submissions, the uncontested facts and the applicable law, the Court is of the opinion that Guardian's motion for summary judgment should be GRANTED; and Berner's motion for partial summary judgment should be DENIED.  Berner's motion to strike is also DENIED.

## II.      FACTUAL BACKGROUND

On January 1, 1994, Guardian issued a group disability insurance policy (the "Plan") to provide disability income benefits to eligible employees of Butler & Binion, LLP.  Under the terms of the Plan, an individual is considered "totally disabled" during the first 60 months (five years) of coverage, if the employee is "totally unable to perform all the material duties of his regular occupation on a full-time basis due to sickness or injury."  (Docket Entry No. 13, Ex. D; *see also* Ex. B. at 000633 - 634.)  After the first 60 months, however, the definition of "total disability" changes and requires that the employee be unable to perform the material duties of any suitable occupation.  *Id.*  In determining whether an occupation is suitable, Guardian looks at an employee's education, training and experience, and prior occupation and earnings. *Id.* The Plan also contains special limitations for a disability caused by mental or emotional conditions. Specifically, the Plan provides, in relevant part, that payments for a disability caused by a mental or emotional condition, alcohol abuse or drug abuse "stop at the earliest of:  (a) the end of two years of payments by this plan; (b) the end of the maximum payment period shown in the schedule; or (c) the date the disability ends."  (Docket Entry No. 13, Ex. D).

The administrative record divulges the following chronology relative to Berner's claim:

- **June 1998**.  Berner began working for Butler & Binion, LLP as a legal secretary.  (*See* **Docket Entry No. 13, Ex. B**  at  GLIC/Berner 000789.)

- **April 6, 1995**.  Berner stopped working due to illness.  (*Id.*)

- **June 9, 1995**.  Berner made a claim for long-term disability benefits based on a diagnosis of Huntington's disease.  Born on August 20, 1959, she was 35 years old at the time of her alleged disability.  (*Id.* at 00061, 000792) Objective findings supporting the diagnosis consist of DNA testing.  Documented symptoms are depression and memory loss. (*Id.* at 000536 -537, 00061, 000648 - 649)

- **June 21, 1995**. Guardian approved Berner's claim effective July 5, 1995. (*Id.* at 000773).  Berner's salary was noted as being $31,125.00 annually and she was covered for 60% of her salary.  (*Id.* at 000788).   Her claim is supported by an Attending Physician Statement from Dr. Tetsuo Ashizawa, a neurologist, who stated that Berner has a Class 5 physical impairment rating ("Severe limitations of functional capacity; incapable of minimal [sedentary] activity [75-100%]"), and a Class 5 mental/nervous impairment rating ("Patient has significant loss of psychological, physiological, personal and social adjustment [severe limitations]").  (*Id.* at 000795.)

- **May 13, 1996**.  The Social Security Administration approved Berner's application for disability, with a finding of a disability onset date of April 1, 1995.  (*Id.* at 000740 - 742.)

- **June 26, 1996**.  Guardian wrote to Berner requesting reimbursement in the amount of $9,166.89, as a result of Social Security disability benefits received.  (*Id.* at 000696.)

- **July 24, 1996**.  Berner forwarded a check in the amount of $9,166.89 to Guardian as reimbursement on its overpayment relative to her disability claim.  (*Id.* at 000729.)

- **January 6, 2000**.  Guardian sent  Berner a letter advising that on July 5, 2000 (after 60 months of disability), the definition of "total disability" under the terms of the Plan change from "unable to perform the material duties of his/her regular occupation or employment" to "unable to perform the material duties of any and every suitable occupation." (*Id.* at 000633 -634.)

- **April 23, 2001**. Dr. Mario Coscia, Berner's internist and endocrinologist, completed a 2001 Attending Physician Statement relative to her condition. He noted that Berner was totally disabled for her usual occupation as well as *any* occupation.  Nonetheless, he reported that Berner exhibited a Class 1 physical impairment rating, meaning "[n]o limitation of functional capacity; capable of heavy work * no restrictions [0-l0%]") and a Class 3 mental/nervous impairment rating, meaning "[p]atient is able to engage in only limited stress situations and

engage in only limited interpersonal relationships [moderate limitations]". (***Id***. at 000552 - 553).

- **April 25, 2002**. Dr. Coscia also completed a 2002 Attending Physician Statement relative to Berner's condition.  Despite his statement that he anticipates that Berner will never be able to return to work, he again reported that she exhibited no physical limitations that preclude her return to work- a Class 1 physical impairment rating.  He also reported her as exhibiting a Class 1 impairment rating of no limitation relative to her degree of cardiac functional capacity.  He made no finding as to her "degree of mental/nervous impairment." (***Id***. at 000572 - 573).

- **May 1, 2003**. Guardian retained ClaimSource to assist in managing its long-term disability claims. ClaimSource is a third-party administrator specializing in disability case management. (***Id***. at 000569 - 570, 000593).

- **May 22, 2003**. ClaimSource contacted Berner to request information concerning her current condition. ClaimSource requested that Berner complete forms for Activities of Daily Living; Training, Education and Experience; and an Authorization to Release Information and return the forms within 21 days of the date of the letter. (***Id***. at 000570).

- **June 20, 2003**. Berner forwarded a list of her current physicians to ClaimSource. The list included Ronald Garb, M.D, (psychiatrist), A. Mario Coscia, M. D., P.A. (internal medicine), Yongxin Chen, M.D. (allergist), and Edwin J. Taegel, M.D. (orthopedic) (***Id***. at 000549).

- **August 7, 2003**. Pursuant to the authorization signed by Berner on June 20, 2003, ClaimSource requested medical records from Berner's treating physicians.  (***Id***. 000012, 00051l, 000586, 000475, 000544).

- **August 7, 2003**.  In completing the Activities of Daily Living form, Berner stated that her medical problems included Huntington's disease, asthma, allergies, irritable bowel syndrome, depression, and hypothyroidism.  She also reported that she is able to drive, handle financial responsibilities, and complete household chores, including laundry, dusting, vacuuming and washing dishes.  She also stated that she needs 12-plus hours of sleep per day and has problems with memory and irritability. (***Id***. at 000523 - 526).

- **August 7, 2003**.  In the Training, Education and Experience form, Berner stated that she has a twelfth-grade education with no college, vocational or military training.  She advised that she was able to only partially complete the form, because she needed to dig into some back filing to find the information.  She further stated that she gets overwhelmed, mentally and emotionally in putting her experience with HD on paper and that her problems are typical of the symptoms that she has experienced in relation to HD.  (***Id***. at 000521, 000527-529).

- **August 8, 2003**.  Dr. Ronald Garb, Berner's psychiatrist, completed a mental residual functional capacity assessment. The assessment covered four categories: (1) understanding and memory, (2) sustained concentration and persistence, (3) social interaction, and (4) adaptation. He reported that Berner is (1) "not significantly limited" or "moderately limited" in areas of understanding and memory; (2) "moderately limited" in all areas of sustained concentration; (3) "not significantly limited" or "moderately limited" in areas of social interaction; and (4) "moderately limited" in all areas of adaption. He also noted that these abilities "will probably get worse over time." (***Id.*** at 000595 - 590).

- **September 4, 2003**. Endocrinologist/internist Dr. Coscia advised that he is unwilling to complete a physical capacity evaluation on Berner because he had not seen her since December 2002.  His office reported that she cancelled her last appointment.  (***Id.*** at 000474, 000514).

- **September 10, 2003**. Medical records were received from Dr. Coscia, verifying that he has not seen Berner since December 2002. (***Id.*** at 000474).

- **January 20, 2004**.   ClaimSource sent Berner a request for a new medical authorization and an updated list of current treating physicians.  Berner specified an expiration date of December 31, 2003, on the prior medical authorization.  (***Id.*** at 000469 - 470).

- **February 17, 2004**. Berner sent an updated list of her current treating physicians within the last 12 months, identifying endocrinologist/internist Dr. Coscia, psychiatrist Dr. Garb, and allergist, Dr. Chen. (***Id.*** at 000013).

- **May 20, 2004**. ClaimSource sent record requests to Drs. Coscia, Garb, and Chen. (***Id.*** at 000449, 000459, 000461).

- **May 20, 2004**. Dr. Garb, Berner's psychiatrist, completed another mental residual functional capacity assessment.  This assessment indicated that Berner had improved since 2003 in all four categories of the assessment: understanding and memory; sustained concentration and persistence; social interaction; and adaptation.  His assessment made no mention of Huntington's disease.  (***Id.*** at 000450 - 451; *see also* ***Id.*** at 000398).

- **July 27, 2004**.   Records received from allergist Dr. Chen covering the period from January 2002 through March 2004 indicate that Berner had been seen for allergic rhinitis, sinus infections, sore throats, and asthma. (***Id.*** at 000398 - 447).

- **July 27, 2004**. Martha at Dr. Ashizawa's office contacted ClaimSource and advised that Dr. Ashizawa, the neurologist who originally diagnosed Berner with Huntington's disease, had not seen Berner in at least two years.  (***Id.*** 000394).

- **July 29, 2004**. ClaimsSource again sent a request for medical record to Dr. Coscia's office. (*Id.* at 000390 - 392; *see also Id.* at 000351 (documenting four phone calls to Dr. Coscia's records service).

- **August 2, 2004**. A representative of Dr. Ashizawa's office contacted ClaimSource to advise that they have no records for Berner and that records older than seven years were no longer available. (*Id.* at 000357).

- **October 14, 2004**. ClaimSource contacted Dr. Coscia's office and advised that his failure to provide medical records, including office/chart notes from December 2002 through the present, could have an adverse affect on Berner's monthly long-term disability benefits. (*Id.* at 000352 - 353).

- **January 27, 2005**.  Based on its review of the available materials, ClaimSource completed a Claim Summary and Action Plan. (*Id.* at 000344, 000388).  The Claim Summary and Action Plan concluded that Berner's claim should be reviewed by a medical consultant after records were received from Dr. Coscia. (*Id.* at 000388).

- **April 1, 2005**.  At ClaimSource's request, Dr. Bernard Stevens completed a Medical Consult Response based on the available medical records. (*Id.* at 000144 - 147, 000149).  Dr. Stevens' review of available medical records indicated that Berner's work-related impairments included Huntington's disease and asthma, but that her medical records did not substantiate any neurological deficits or other physical impairments that precluded her ability to perform any and all work.  (*Id.* at 000144 - 145).  He noted that although Dr. Ashizawa, neurologist, confirmed a diagnosis of Huntington's disease in 1995, Dr. Ashizawa, nevertheless, stated in his 1996 and 1997 attending physician statements that Berner had no limitation of functional capacity.  (*Id.* at 000145; 000536 - 537; 000538-539).  He also noted that Dr. Coscia's 1998, 2001 and 2002 Attending Physician Statements stated that Berner has no limitation of functional capacity. (*Id.* at 000145; 000163 - 164; 000266 - 267; 000540 - 541; 000552 - 553; 000572 - 573). In his Medical Consult Response, Dr. Stevens reported that Berner's records contained several documents authored by her, the most recent being a letter dated August 5, 2003. (*Id.* at 000521 - 522).  He noted that the letter "demonstrated good organization and [a] clear presentation of the intended ideas."  From this, he inferred that Berner demonstrated the ability to perform fine dexterous motions with both of her hands.  (*Id.* at 000144).  Dr. Stevens ultimately concluded that Berner is capable of performing light work. (*Id.* at 000145).

- **April 1, 2005**. Dr. Stevens also completed a Medical Consultant Review - Estimation of Physical Capacities.  (*Id.* at 000146 - 147).  In his review, he estimated that Berner had the ability to sit, stand, and walk at a maximum of 2 continuous hours and a total of 6 hours during an 8-hour day.  He also estimated that she could lift up to 20 pounds, up to 10 pounds frequently, and that she has no restrictions in normal functioning of the extremities.  (*Id.* at 000146).

- **April 5, 2005**.  ClaimSource forwarded Dr. Stevens' Medical Consult Response to Dr. Coscia and requested that Dr. Coscia advise whether he agreed with Dr. Stevens' report.  If he disagreed, ClaimSource requested that he comment in narrative form, including clinical evidence in support of his opinion.  (**Id.** at 000140 - 142).

- **April 11, 2005**.  Sharon Alifantis, MS, CRC, completed a Vocational Assessment of Berner's capabilities. She adopted Dr. Stevens' conclusion that Berner is capable of performing sedentary to light work.  Using this conclusion and the information provided by Berner in her Training, Education and Experience form, Alifantis performed a vocational analysis and determined that Berner is capable of performing work as a legal secretary, social secretary, or correspondence clerk. (**Id.** at 000067 - 70, 000136 - 139).

- **April 25, 2005**.  Dr. Coscia's office advised that Dr. Coscia passed away in October of 2004.  (**Id.** at 000134).

- **April 26, 2005**.  Dr. Coscia's office advised that the "new doctor," Dr. Amer Al-Karadsheh, will reply to ClaimSources' April 5, 2005 request. (**Id.** at 000133).

- **June 3, 2005**.  Berner contacted ClaimSource and stated that she was unhappy with Dr. Al-Karadsheh and would be changing physicians.  She also stated that she had an appointment to see another physician on June 23, 2005, who will be following her care for her thyroid problem.  Berner advised that she was not seeing a neurologist but that she planned to see one at Baylor University as they are specialists for Huntington's Disease.  Berner also stated that she was still seeing her psychiatrist, who prescribes her medication.  During this call, the ClaimSource representative, Leslie Murphy, explained the 24-month maximum for mental and nervous conditions.  (**Id.** at 000124).

- **June 10, 2005**.  Berner sent ClaimSource a letter stating that she planned to schedule an appointment with neurologist Dr. Ondo at Baylor College of Medicine; that she saw her new general practitioner, Dr. Luz Gascot, two days prior; that she saw allergist Dr. Chen for an upper respiratory infection the day before; and that she had an appointment with a gynecologist scheduled for June 21, 2005. (**Id.** at 000121 – 123).

- **June 15, 2005**.  ClaimSource (now dba Disability Management Alternatives) sent a request for medical records to Dr. Gascot.  (**Id.** at 000118 - 119).

- **July 21, 2005**.  Berner wrote to ClaimSource to advise that she had an appointment scheduled with neurologist Dr. William G. Ondo on August 15, 2005. (**Id.** at 000114).

- **August 16, 2005**.  ClaimSource wrote to Drs. Ondo and Gascot forwarding a copy of Dr. Stevens' Medical Consult Response and requesting that each of them

advise whether he agreed with Dr. Stevens' report.  If one of them disagreed, ClaimSource requested that he comment in narrative form, including clinical evidence in support of his opinion.  (*Id.* at 000110 - 111).

- **August 22, 2005**. Dr. Gascot's office telephoned ClaimSource and advised that Dr. Gascot was not seeing Berner for any condition related to her disability.  (*Id.* at 000106).

- **September 12, 2005**. ClaimSource again wrote to Dr. Ondo requesting his comments on Dr. Steven's physician consultant report.  (*Id.* at 000107 -110).

- **September 29, 2005.** With the available medical records provided by psychiatrist Dr. Garb, endocrinologist/internist Dr. Coscia, and allergist Dr. Chen, Dr. Stevens' Medical Consultant Response, the Physical Capacities Evaluation, and the Vocational Analysis, ClaimSource concluded that Berner was not totally disabled and prepared a Definition Recommendation to Guardian that Berner's benefits be terminated. (*Id.* at 000247-250).  The recommendation was forwarded to Guardian on September 29, 2005.  (*Id.* at 000217). Supporting documentation was forwarded to Guardian the following day. (*Id.* at 000065).

- **October 4, 2005**. Arlene Tyler of Guardian e-mailed Robert DiGian of ClaimSource, stating that the review of Berner's claim had been completed and that Guardian was in agreement with the recommendation to deny further benefits.  (*Id.* at 000057 - 58).

- **October 6, 2005**. ClaimSource sent Berner a letter advising of the determination that she no longer satisfied the definition of "total disability" under the policy. (*Id.* at 000059 - 64). The letter described the review of Berner's available medical information, the physician consultant review, the Physical Capacities Evaluation, and the Vocational Assessment.  (*Id.* at 000060 - 62). ClaimSource also advised Berner that benefits would continue to be paid through November 4, 2005, as a gesture of good faith and concern, but that this payment should not be construed as an admission of liability by Guardian. (*Id.* at 000063). Finally, the letter informed Berner of her appeal rights and provided her with the address to which she should address any appeal within 180 days. (*Id.* at 000063 - 64).

- **October 14, 2005**. Berner sent ClaimSource two letters. The first letter requested a temporary reinstatement of her benefits and a "delay [in its] premature decision" until Dr. Ondo had an opportunity to respond to ClaimSource's request for information.  In her second letter, Berner advised that she had spoken with "Faye" at Dr. Ondo's office and that Dr. Ondo had faxed ClaimSource a letter on September 12, 2005. (*Id.* at 000212 - 214, 000216).  No such letter appears as part of the administrative record.

- **October 18, 2005**.  ClaimSource wrote to Berner and informed her that her claim had been transferred to Carrie Jo Peters, Disability Claim Manager, for handling of her appeal. (*Id.* at 000211).

- **October 20, 2005**.  ClaimSource acknowledged receipt of Berner's appeal request dated October 14, 2005, and advised that her claim was being reviewed along with any documents that she may have submitted with her appeal.  It also informed Berner that the review of appealed claims is generally completed within 45 days of receipt, absent special circumstances and further requested that she supply any objective medical evidence that would support her claim of disability. (*Id.* at 000210).

- **February 2, 2006**.  ClaimSource wrote to Berner advising that it had not received any medical evidence from her or her physicians to review and further informed her that unless it received additional medical evidence in support of her disability by March 29, 2006, her claim would be closed. (*Id.* at 000034, 000209).

- **March 20, 2006**.  Berner wrote to ClaimSource advising of her intent to appeal the decision to deny her long-term disability benefits and requesting a copy of the instructions on how to appeal the decision,[2] a copy of the Plan in effect at the time of her initial claim approval, as well as a copy of any and all doctor's reports, records, forms, etc. that ClaimSource relied on in reaching the decision to deny her claim.  (*Id.* at 000207.)  She further advised that her initial request for appeal was incomplete and that she would be forwarding additional information.  (*Id.* at 000208).

- **March 23, 2006**.   Berner wrote to ClaimSource thanking it for sending the instructions on how to appeal and requesting a copy of the Plan in effect at the time of her initial claim as well as an extension of the deadline within which to comply with its request for evidence in support of her appeal.  (*Id.* at 000191 - 192).

- **March 28, 2006**. Berner sent a letter to ClaimSource asking for an extension until April 17.  She inquired as to whether she could mail her appeal on March 29, rather than have it delivered to ClaimSource by March 29, if the extension was not granted. (*Id.* at 000196 - 197).  On the same date, she sent a second letter, again requesting an extension until April 17, 2006. (*Id.* at 000193).

- **April 3, 2006**. ClaimSource acknowledged Berner's March 28 letter, agreed to an extension, and asked her to forward her information in support of her disability by April 17, 2006. (*Id.* at 000190).

---

[2] Page 6 of the denial letter from ClaimSource to Berner denoted that additional instructions on how to appeal the denial decision were attached.  However, the attachment appears to have been omitted.

- **April 17, 2006**.  Berner faxed ClaimSource a letter dated April 2, 2006, asking for a further extension of the deadline within which to timely file her appeal until June 22, 2006.  (**Id.** at 000183 - 187.)  Also, on April 17, 2006, Berner faxed a second letter to ClaimSource dated April 2, 2006.  In this letter she:  (1) notified it that the purpose of her letter was to appeal the initial denial of benefits decision; (2) provided a brief background concerning her medical history, employment and 1995 disability claim; (3) described the symptoms of Huntington's disease; (4) referenced an unattached draft of her statement as to why she is unable to work; (5) referenced statements of family and friends, which were also not included with the letter; (6) described an injury to her right foot in 1997; (7) described two neck injuries sustained in "the 80's"; (8) referenced a medical note from Edwin J. Taegel, M.D., F.A.C., dated April 4, 2006, which denoted that she exhibited pain in her left upper trapezious border and along her left scapula thoracic area and that X-rays indicated narrowing at C4-5 and C5-6 with arthritis of the epiphyses in the same areas; (9) discussed her asthma and allergies to many things, including mold, cats, dogs, and Johnson Grass; and (10) referenced an index of attachments, which were not forwarded with the letter, but were to be provided by her to ClaimSource by priority mail.  By way of her second letter dated April 2, 2006, Berner also denoted her specific disagreements with ClaimSource's denial letter dated October 6, 2005.  (**Id.** at 000176.)

- **April 18, 2006**. ClaimSource denied Berner's request for an extension until June 22, 2006, noted that it did not receive any of the materials referenced in her letter, and advised her that her claim was closed and that she had exhausted all of her remedies. (**Id.** at 000100).

- **April 21, 2006**.  Berner wrote to ClaimSource to complain that ClaimSource had not previously told her that any additional information had to be received by it before the close of business on April 17, 2006. (**Id.** at 000035 - 46) (12-page fax transmission).   She included a copy of a U.S. Postal Service Delivery Confirmation Receipt dated April 17 as proof that she sent ClaimSource additional documentation in support of her claim, (**Id.** at 000041), and a fax cover sheet dated April 19, 2006, which purported to send along 23 pages of the attachments referenced in her April 17 letter.  (**Id.** at 000044).  ClaimSource denies that it received any of the attachments at any time.

- **April 21, 2006**.  ClaimSource affirmed its decision not to allow Berner a further extension of the time within which to provide additional information and advised her that she had exhausted all of her remedies. (**Id.** at 000033).

- **September 10, 2008**.  Berner filed suit in this court against the LTD Plan and Guardian, alleging that Guardian abused its discretion in terminating her long-term disability benefits and that she was denied a full and fair review of her claim.  On July 14, 2009, Guardian moved for summary judgment on all of Berner's claims.  On July 15, 2009, Berner filed a cross-motion for summary judgment.  On July 22, 2009, Berner filed a motion to strike the Affidavits of Linda

Hernandez, Teresa Sanchez,[3] Erik Fritz and Rosemarie McCathy and their attachments filed in support of Guardian's motion for summary judgment.

## III.   CONTENTIONS OF THE PARTIES

### A.   Guardian's Contentions

Guardian contends that it is entitled to summary judgment in this case because there is no evidence in the administrative record indicating that it abused its discretion in making the benefits determination at issue.  It also asserts that there is no evidence in the administrative record supporting Berner's contention that she was denied a full and fair review of her claim. Accordingly, it contends that it is entitled to judgment as a matter of law on Berner's claims.

### B.   Berner's Contentions

Berner argues that Guardian abused its discretion when it terminated her benefits because there was no rational connection between its conclusion that she was not disabled and the information on which it relied to support that conclusion.  She also contends that Guardian's vocational expert's opinion was based on her pre-morbid abilities.  Berner further contends that Guardian refused to review its initial decision and failed to provide her with a full and fair review of its initial adverse benefit determination by its refusal to review the specific grounds for its determination.  Finally, she avers that while a failure to fulfill the procedural requirements of ERISA generally does not give rise to a substantive damage remedy for situations in which the administrator initially denied benefits, that general rule is inapplicable here and reinstatement of benefits is the appropriate remedy in this case in order to return her to the *status quo ante*.

---

[3] In her sur-reply to Guardian's response to her motion to strike (Docket Entry No. 23), Berner acknowledged that she mistakenly referred to the Affidavit of Teresa Sanchez and its related attachments as not being a part of the administrative record and withdrew her request that such document be stricken.  (*See* Docket Entry No. 23 at 1 – 2.)

## IV.   APPLICABLE LEGAL STANDARDS

### A.   Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  The moving party bears the initial burden of "informing the Court of the basis of its motion" and identifying those portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its burden, the nonmoving party must then "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting FED. R. CIV. P. 56(c), (e)).

In adjudicating a motion for summary judgment, a court is required to view all facts in the light most favorable to the nonmoving party and any inconsistencies are to be resolved in the nonmoving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  During this time, a court must also look to the substantive law underlying the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "[T]he substantive law will identify which facts are material." *Id.*  "A dispute regarding a material fact is 'genuine' if the evidence would permit a reasonable jury to return a verdict in favor of the nonmoving party." *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 651 (5th Cir. 2004).  Thus, "[t]he appropriate inquiry [on summary judgment] is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"

*Septimus v. Univ. of Houston*, 399 F.3d 601, 609 (5th Cir. 2005) (quoting *Anderson*, 477 U.S. at 251 - 52).

### B.      ERISA Standard

The United States Supreme Court has generally held that the denial of a right to benefits under an ERISA plan is reviewed under a *de novo* standard.  *See Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L.Ed.2d 80 (1989); *see also Baker v. Metropolitan Life Ins. Co*., 364 F.3d 624, 629 (5th Cir. 2004).  However, where the benefit plan expressly confers the "discretionary authority to determine eligibility for benefits or to construe the terms of the plan" on the plan administrator or fiduciary, the applicable standard of review is abuse of discretion.  *Firestone*, 489 U.S. at 115, 109 S. Ct. 948; *Baker*, 364 F.3d at 629; *see also Gellerman v. Jefferson Pilot Financial Ins. Co.*, 376 F. Supp.2d 724, 731 (S.D. Tex. 2005) (citing *Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc*., 168 F.3d 211, 213 (5th Cir. 1999). Here, the Plan vests Guardian with discretionary authority to determine eligibility for benefits and thus, the standard of review applicable here is the abuse of discretion standard.  The relevant Plan provision provides that "Guardian is the Claims Fiduciary with discretionary authority to determine eligibility for benefits and to construe the terms of the plan with respect to claims." (*See* Docket Entry No. 10, Ex. A.)

A plan administrator or fiduciary's factual determinations under an ERISA plan are also reviewed pursuant to an abuse of discretion standard.  *Vercher v. Alexander & Alexander, Inc*., 379 F.3d 222, 226 (5th Cir. 2004); *see also Pierre v. Conn. Gen. Life Ins. Co.*, 932 F.2d 1552, 1562 (5th Cir. 1991) (reasoning "for factual determinations under ERISA plans, the abuse of discretion standard of review is the appropriate standard.").  "Under the abuse of discretion standard, '[i]f the plan fiduciary's decision is supported by substantial evidence and is not

arbitrary and capricious, it must prevail.'"  *Corry v. Liberty Life Assur. Co. of Boston*, 499 F.3d

389, 397 - 98 (5th Cir. 2007) (quoting *Ellis v. Liberty Life Assurance Co. of Boston*, 394 F.3d

262, 273 (5th Cir. 2004)).   "Substantial evidence is 'more than a scintilla, less than a

preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion.'"  *Id.*   "A decision is arbitrary when made 'without a rational connection

between the known facts and the decision or between the found facts and the evidence.'"  *Lain v.

UNUM Life Ins. Co. of America*, 279 F.3d 337, 342 (5th Cir. 2002) (quoting *Bellaire Gen. Hosp.

v. Blue Cross Blue Shield of Mich.*, 97 F.3d 822, 828 (5th Cir. 1996)).   A plan administrator or

fiduciary's "decision to deny benefits must be 'based on evidence, even if disputable, that clearly

supports the basis for its denial.'"  *Lain*, 279 F.3d at 342 (quoting *Vega v. Na'l Life Ins. Servs.*,

*Inc.*, 188 F.3d 287, 299 (5th Cir. 1999)).

Ordinarily, when resolving factual controversies, the court's review is confined "to the

evidence before the plan administrator."  *Vega*, 188 F.3d at 299 (internal citations omitted); *see

also Wilbur v. ARCO Chemical Co.*, 974 F.2d 631, 639 (5th Cir. 1992).  It is not confined to the

administrative record, however, when determining whether an administrator abused his

discretion in interpreting the plan's terms and making a benefit determination.  *Wilbur*, 974 F.2d

at 639.

The Fifth Circuit usually employs a two-step analysis when determining whether an

administrator has abused its discretion in construing the plan's terms.  *James v. Louisiana

Laborers Health and Welfare Fund*, 29 F.3d 1029, 1032-33 (5th Cir. 1994).  First, the court must

determine whether the plan administrator's interpretation was the legally correct interpretation.

*Id.*  Second, if the plan administrator's interpretation was not the legally correct interpretation,

then the court must consider whether the administrator's interpretation amounts to an abuse of

discretion.  *Id.*  But, "if the administrator's interpretation and application of the Plan is legally correct, then [the] inquiry ends because obviously no abuse of discretion has occurred."  *Baker*, 364 F.3d at 629 – 30 (citing *Spacek v. Maritime Ass'n*, 134 F.3d 283, 292 (5th Cir. 1998)).

Further, where, as here, the role of the administrator presents a conflict of interest because it evaluates claims for benefits and pays benefits, the Court must consider this conflict as a factor in determining whether there has been an abuse of discretion.  *Firestone*, 489 U.S. at 115, 109 S.Ct. 948 (citations omitted) (holding "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'")  Most recently, the United States Supreme Court in *Metro. Life Ins. Co. v. Glenn*, resolved any debate relative to its finding in *Firestone* by holding that the conflict of interest created by a plan administrator's dual role is "but one factor among many that a reviewing judge must take into account."  *Metro. Life Ins. Co. v. Glenn*, _____ U.S. _____, 128 S.Ct. 2343, 2351, 171 L. Ed.2d 299 (2008). That is to say, "when judges review the lawfulness of benefit denials, they will often take account of several different considerations of which a conflict of interest is one."  *Id.* Nevertheless, such a conflict does not necessitate that a court "create special burden-of-proof rules, or other special procedural or evidentiary rules" focused on the party with the apparent conflict of interest when other rules or standards are applicable.  *Id.*

## V.   ANALYSIS AND DISCUSSION

### A.   The Administrative Record and Berner's Motion to Strike

Berner argues that the evidence offered by Guardian in support of its motion for summary judgment, mainly the Affidavit of Linda Hernandez, Exhibit A, the Affidavit of Erik Fritz, Exhibit C, and the Affidavit of Rosemarie McCathy, Exhibit D, and their attachments, must be

stricken for two reasons.  First, she contends that the district court must consider only the evidence that was available to the plan administrator at the time of its decision.  Second, she contends that the affidavits proffered by Guardian are not part of the administrative record. Guardian, on the other hand, contends that the affidavits and attachments filed in support of its motion for summary judgment are "proper, admissible summary judgment evidence" and should be considered by this Court as relevant to its determination.

Generally, when assessing factual determinations in an ERISA action, courts are restricted to evidence that was before the plan administrator.  *See Vega*, 188 F.3d at 299.  Fifth Circuit case law has long recognized that "[t]he plan administrator has the obligation to identify the evidence in the administrative record and [that] the claimant must be afforded a reasonable opportunity to contest whether that record is complete."  *Estate of Bratton v. National Union Fire Ins. Co. of Pittsburgh, PA*, 215 F.3d 516, 521 (5th Cir. 2000) (citing *Vega,* 188 F.3d at 295, 299 (citing *Barhan v. Ry-Ron Inc.*, 121 F.3d 198, 201-02 (5th Cir. 1997)).  "Once the administrative record has been determined, the district court may not stray from it but for certain limited exceptions, such as the admission of evidence related to how an administrator has interpreted terms of the plan in other instances, and evidence, including expert opinion, that assists the district court in understanding the medical terminology or practice related to a claim." *Estate of Bratton*, 215 F.3d at 521 (citing *Vega*, 188 F.3d at 299).  "Thus, the administrative record consists of relevant information made available to the administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator a fair opportunity to consider it." *Estate of Bratton*, 215 F.3d at 521 (internal citation omitted); *accord Gooden v. Provident Life & Accident Ins. Co.,* 250 F.3d 329, 333 (5th Cir. 2001).

In the instant case, the Plan under which Berner received benefits was destroyed in 2004. The Affidavits of Linda Hernandez, Erik Fritz and Rosemarie McCathy and their related attachments filed in support of Guardian's motion for summary judgment as Exhibits A, C and D, respectively, relate to the Plan and should be admitted as proper summary judgment evidence in this case.  As set forth above, a district court is allowed to go beyond the administrative record and permit the "admission of evidence related to how an administrator has interpreted terms of the plan in other instances."  *Estate of Bratton*, 215 F.3d at 521 (citing *Vega*, 188 F.3d at 299). The Affidavits of Linda Hernandez, Erik Fritz and Rosemarie McCathy accomplish this very objective because in order for this Court to properly evaluate Berner's claim, the provisions of the Plan are essential and must be examined.  Moreover, Guardian has consistently maintained in this case that it has been unable to locate an original or complete copy of the Plan, as the Plan was terminated in 1996.  In accordance with its retention policy in effect at the time, the Plan was maintained for 7 years following its termination and destroyed in 2004.  Guardian alleges that the Plan was not destroyed in bad faith and Berner has not offered any evidence to suggest otherwise.  Nor has she alleged or offered any evidence to suggest that the provisions in the Plan were other than as proffered by Guardian in support of its motion for summary judgment.  Thus, because Guardian is unable to locate an original or complete copy of the Plan, the Affidavits of

Linda Hernandez,[4] Erik Fritz[5] and Rosemarie McCathy[6] and their related attachments should be admitted as secondary evidence of the Plan's terms, as there is no dispute that the Plan existed or that Berner recovered benefits under the Plan for more than 10 years.  *See Bituminous Cas. Corp. v. Vacuum Tanks, Inc.*  975 F.2d 1130, 1132 - 33 (5th Cir. 1992) (reasoning that "[w]here the actual policy is not available, the terms of the contract can be shown by secondary evidence."); *see also* FED. R. EVID. 1004.  Accordingly, Berner's motion to strike is DENIED and Exhibits A, C and D to Guardian's motion for summary judgment are admitted as proper summary judgment evidence.

### B.    Berner's Claim for Wrongful Denial of Benefits

In the instant action, Guardian, by way of its third-party disability claims manager, ClaimSource, made a factual determination that Berner no longer satisfied the definition of "disability" under the Plan, and, accordingly, concluded that her long-term disability benefits

---

[4] In her affidavit, Linda Hernandez states that she has been employed by Guardian since October 16, 1989, and that she currently works as a Business Specialist in its Group Client Administration Development and Support Division. She asserts that Guardian maintains a database that identifies the various ERISA provisions contained in welfare plans issued by it in accordance with the date that the Plan was issued.  She further asserts that as a Business Specialist she is familiar with Guardian's database, has reviewed it and determined the version of the "Claims Procedure" provision that was in the LTD Plan which was issued on January 1, 1994.  Attached to her affidavit are two pages of print-outs of the computer screens, which identify the "Claims Procedure" provision that was included in all ERISA plans issued by Guardian between October 13, 1993, and February 9, 1994.  Also attached is a copy of the "Claims Procedure" identified as being a part of the LTD Plan at issue.  (*See* Docket Entry No. 13, Exhibit A).

[5] In his affidavit, Erik Fritz states that he has been employed by Guardian as a Manager in its Office Services Division since 1985 and that he is familiar with Guardian's retention schedules for plan documents, including the Plan at issue.  He confirms that the Plan was terminated in 1996, maintained for 7 years thereafter, and destroyed in 2004 in compliance with Guardian's policy.  (*See Id*., Exhibit C).

[6] In her affidavit, Rosemarie McCarthy states that she has been employed by Guardian since September 26, 1988, and that she currently works as a Manager in its Risk Management Services, Life and Disability Claims Division. She asserts that Guardian maintains a computer database that identifies the various ERISA provisions contained in its welfare plans and a computer database that provides the text of the provisions identified.  She further asserts that as a Manager in the Risk Management Services, Life and Disability Claims Division she is familiar these databases and depends on the accuracy of the information contained within them in order to perform her job responsibilities. She states that she has reviewed the information contained in the databases in order to determine the definition of "total disability" as well as the coverage limitations relative to mental or emotional conditions that were in the Plan at issue.  Attached to her affidavit are 6 pages, including 3 computer-screen printouts and 3 form plan provisions relevant to the Plan at issue.  (*See Id.*, Exhibit D).

should be terminated.  Berner argues that Guardian abused its discretion in terminating her benefits and in failing to consider her cognitive functioning and limitations.

A determination that a participant is not disabled is "more factual in nature than interpretive in nature" and must be reviewed under an abuse of discretion standard.  *See Sweatman v. Commercial Union Ins. Co.*, 39 F.3d 594, 598 (5th Cir. 1994); *see also Lain*, 279 F.3d at 342; *Meditrust Fin. Servs. Corp.,* 168 F.3d at 213; *Pierre*, 932 F.2d at 1562 (reasoning "for factual determinations under ERISA plans, the abuse of discretion standard of review is the appropriate standard.")  Generally, the application of the abuse of discretion standard requires this Court to employ the two-step analysis previously set forth by this Court in its standard of review section.  *See James*, 29 F.3d at 1032 - 33.  However, "[w]hen, as here, the case does not turn on sophisticated Plan interpretation issues, the Court is not required to apply the two-step process . . . [set forth] above.  *Schaffer v. Benefit Plan of Exxon Corp.*, 151 F. Supp.2d 799, 806 (S.D. Tex. 2001) (citing *Duhon v. Texaco, Inc.*, 15 F.3d 1302, 1307 n. 3 (5th Cir. 1994) ("However, the reviewing court is not rigidly confined to this two-step analysis in every case."); *Rigby v. Bayer Corp.,* 933 F. Supp. 628, 631-32 (E.D. Tex. 1996) (eschewing the two-step inquiry of *Wildbur* and asking simply whether the Administrator abused its discretion)).  Instead, it must determine "whether there was substantial evidence to support the denial[] of benefits."  *Schaffer*, 151 F. Supp.2d at 806.  "Under the abuse of discretion standard, '[i]f the plan fiduciary's decision is supported by substantial evidence and is not arbitrary and capricious, it must prevail.'"  *Corry*, 499 F.3d at 397 - 98 (quoting *Ellis*, 394 F.3d at 273).  "Substantial evidence is 'more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Id.*  "A decision is arbitrary when made 'without a rational connection between the known facts and the decision or

between the found facts and the evidence.'" *Lain*, 279 F.3d at 342 (quoting *Bellaire Gen. Hosp.*, 97 F.3d at 828).

Additionally, "[i]n assessing a claim for disability, 'courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician.'" *Abate v. Hartford*, 471 F. Supp.2d 724, 737 (E.D. Tex. 2006) (quoting *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003)). "Furthermore, an administrator has no duty to conduct an independent investigation before denying a claim." *Abate*, 471 F. Supp.2d at 737 (citing *Vega*, 188 F.3d at 299) (noting that "when confronted with a denial of benefits . . . the district court may not impose a duty to reasonably investigate on the administrator"). "Nonetheless, '[a]lthough the administrator has no duty to contemplate arguments that could have been made by the claimant, [a court should] expect the administrator's decision to be based on evidence, even if disputable, that clearly supports the basis for its denial.'" *Id.*

This Court concludes, after evaluating Guardian's factual determinations under an abuse of discretion standard, that such determinations are supported by substantial evidence.   In considering Berner's capabilities, Guardian relied on Berner's condition post-July 2000, which included medical records from Berner's treating physicians, including Dr. Ronald Garb, her psychiatrist/neurologist, Dr. Coscia, her internist and endocrinologist, and Dr. Chen, her allergist, as well as assessments conducted by an independent physician consultant and a certified rehabilitation counselor it retained.

Guardian noted that in 2001 and 2002, in attending physician statements, Dr. Mario Coscia, Berner's internist and endocrinologist, concluded that she had no limitation of functional capacity or cardiac functional capacity, that she was "capable of heavy work" and that she had

no physical restrictions.  (Docket Entry No. 13, Ex. B. at 000552 – 553; 000572 – 573).  He also concluded, however, in the 2001 statement that Berner was able to "engage in only limited stress situations and . . . in only limited interpersonal relationships."  (*Id.* at 000553).  In 2002, he made no comment on her degree of mental or nervous impairment.  (*Id.* at 000573).  Further, according to Dr. Coscia's physician statement, Berner was also treating with Dr. Tetsuo Ashizawa, a neurologist.  However, Dr. Ashizawa's office informed ClaimSource in 2004 that it had no medical records on file for Berner.  (*Id.* at 000357).  It further stated that if her records were more than 7 years old, they were no longer available, suggesting that Dr. Ashizawa had not seen Berner in more than 7 years.  (*Id.*)

In August of 2003, according to a Mental Residual Functional Capacity Assessment, Dr. Garb, Berner's psychiatrist, found her to be "not significantly limited" to moderately limited" in the following areas:  (1) understanding and memory; (2) sustained concentration and persistence; (3) social interaction; and (4) adaptation.  (*Id.* at 000594 – 596).  In May of 2004, his assessment noted significant improvement in these areas.  (*Id.* at 000450 – 451).  Also, according to an Activities of Daily Living Form completed by Berner in August of 2003, she stated that she was capable of performing a wide variety of tasks without assistance.  Specifically, she reported that she was capable of driving, traveling without any assistance, handling financial responsibilities, shopping and performing household chores, including laundry, dusting, vacuuming and washing dishes.  (*Id.* at 000523 – 526).

On or about April 5, 2005, ClaimSource forwarded Berner's medical records to Dr. Bernard Stevens, an internist and endocrinologist, for review and assessment.  (*Id.* at 000144 – 145).  Dr. Stevens opined that Berner's "[medical] records indicate[d] that [she exhibited] an inherited neurodegenerative condition, Huntington's disease and Asthma."  (*Id.*)  However, he

noted that many of the records failed to present information relative to Berner's primary diagnosis.  (*Id.*)  He also noted that many of the records and handwritten notes from Dr. Coscia, Berner's internist and endocrinologist, reflected treatment for many self-limited medical conditions.  (*Id.*)  He opined that records from Dr. Coscia did not mention any neurological findings, and attending physician statements did not mention the presence of any physical limitations.  (*Id.*)  He noted that certain letters from Berner contained in the file demonstrated good organization as well as the clear presentation of ideas.  (*Id.*)  He also noted that the letters inferred Berner's ability to perform fine dexterous motions with both of her hands.  (*Id.*)  He stated that upon his review of the Activities of Daily Living form prepared by Berner that the entries were complete and reflected that she exhibited at least normal intellectual skills.  (*Id.*)  He further noted that although neurologist Dr. Ashizawa confirmed that Berner was diagnosed with Huntington's disease in 1995, he completed physician statements in 1996 and 1997 that noted that she exhibited no limitation of functional capacity.  (*Id.*)  Finally, he concluded that Berner's medical "records did not substantiate any neurological deficits or physical impairments that preclude[d] the ability to perform *all* work."  (*Id.*)  He also completed a physical capacities evaluation form relative to Berner and opined that she "is capable [of] perform light work and this capacity was attested by the activities of daily living" form that she completed.  (*Id.*)

A copy of Dr. Stevens' report and assessment was subsequently sent to Berner's treating physicians for review and comments.  Dr. Coscia's office advised that he had passed away and that Dr. Amer Al-Karadshed, also an endocrinologist, would provide a response relative to Berner's condition.  Thereafter, Dr. Al-Karashed reported that he could not express any opinions, in agreement or disagreement, with Dr. Stevens' resport.  Dr. Gascot, Berner's general practitioner, advised that he was not seeing Berner for any condition related to her disability and

Dr. Ondo, her newly-treating neurologist, simply failed to respond to ClaimSource's requests, despite repeated requests for comments.

On April 11, 2005, Sharon Alifantis, a certified rehabilitation counselor, performed a vocational assessment in which she concluded that Berner was capable of performing work activities within the sedentary to light exertion level, such as that of a legal or social secretary or correspondence clerk.  (*Id.* at 000136 – 139).

Berner advances a variety of allegations in support of her claim, however, none justifies a finding in this instance that Guardian abused its discretion.[7]  Berner argues that Guardian abused its discretion by considering only medical records that covered the period from January 2003 to late September 2005.  She also argues that Guardian failed to consider her loss of cognitive abilities.  She further avers that Dr. Stevens expressly declined to evaluate any impairments of mental functioning resulting from Huntington's disease, as he noted that it was outside of his "professional purview."  She notes that Dr. Stevens did not personally examine her before rendering his conclusions.  She then argues that the vocational assessment relied on by Guardian was based only upon her known physical capabilities.  Finally, she contends that Guardian ignored the disability decision of the Social Security Administration ("SSA") in denying her benefits claims.

The Court finds Berner's arguments unavailing in light of the standard imposed upon its review.  It is undisputed that Guardian possessed medical evidence indicating that Berner was capable of performing "sedentary to light work."  The Plan expressly provides that an individual is considered "totally disabled" during the first 60 months (five years) of coverage, if the employee is "totally unable to perform all the material duties of his regular occupation on a full-

---

[7] The Court finds Berner's citation to the unpublished decision of *Wyatt v. AMEC Choices Benefits Program Long Term Disability Ins. Plan*, No. Civ. A. H-04-1801, 2005 WL 1186114 (S. D. Tex. 2005) in support of her claims inapposite.

time basis due to sickness or injury."  (Docket Entry No. 13, Ex. D; *see also* Ex. B. at 000633 -

634.)  After the first 60 months, however, the definition of "total disability" changes and requires

that the employee be unable to perform the material duties of *any* suitable occupation.  *Id.*

(emphasis added).  As Dr. Stevens' noted in his Medical Consult Response, Berner's medical

"records did not substantiate any neurological deficits or physical impairments that preclude[d]

the ability to perform *all* work."  Further, the summary judgment evidence presented establishes

that despite ample opportunity, Berner did not submit medical evidence supporting her claim that

she was "totally disabled."   During the review period, she was well aware of the fact that

Guardian's physician consultant, as well as its certified rehabilitation counselor, had opined that

she was capable of performing sedentary to light work.  Moreover, her own physicians did not

disagree.  Therefore, she had the opportunity to refute these opinions through other experts, but

was unable to do so.

The fact that Guardian's decision ignored the decision of the SSA does not compel a

finding that it abused its discretion, as the SSA's determination is not binding on Guardian.  *See*

*Gellerman v. Jefferson Pilot Fin. Ins. Co.*, 376 F. Supp.2d 724, 735 (S.D. Tex. 2005) (internal

citation omitted).  This position is also bolstered by the fact that the SSA's determination that

Berner qualified as "disabled" under its rules was made on May 13, 1996, more than nine years

prior to Guardian's 2005 benefits denial determination.  Nor does Guardian's decision to rely on

the conclusion of a physician who did not physically examine the claimant, but only reviewed

the claimant's medical records require such a finding in this instance.  *Gooden v. Provident Life*

*& Acc. Ins. Co.*, 250 F.3d 329, 335 n.9 (5th Cir. 2001) (citing *Meditrust Fin. Servs. Corp. v.*

*Sterling Chems., Inc.*, 168 F.3d 211, 215 (5th Cir. 1999) (finding that the administrator of a

disability plan did not abuse its discretion by denying a claim after reviewing the claimant's

hospital records, and having its physicians, who were not specialists, review the claim). Accordingly, the Court finds that Guardian did not abuse its discretion in initially denying Berner's claim for continuing disability benefits.

### C.      Berner's  Claim of ERISA Procedural Violations Under § 1133

Berner next alleges that the Plan failed to provide her with adequate procedural safeguards for the appraisal of her claim and that, as a result, she was denied a "full and fair review" of her claim.  Because the protection of the interests of employees and their beneficiaries in employee benefit plans and contractually defined benefits is inherent in ERISA's purpose, "ERISA [mandates that] certain minimal procedural requirements [be followed] upon an administrator's denial of a benefits claim." *Wade v. Hewlett-Packard Development Co. LP Short Term Disability Plan* , 493 F.3d 533, 539 - 40 (5th Cir. 2007) (citing *Schadler v. Anthem Life Ins. Co.,* 147 F.3d 388, 393 (5th Cir.1998)).  Specifically, Section 1133 of ERISA provides that every employee benefit plan must:

> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133.  "Challenges to ERISA procedures are evaluated under the substantial compliance standard."  *Wade*, 493 F.3d at 539 (citing *Lacy v. Fulbright & Jaworski*, 405 F.3d 254, 256-57 & n. 5 (5th Cir. 2005)).  The substantial compliance standard has been interpreted by the Fifth Circuit to mean that "technical noncompliance with ERISA procedures will be excused so long as the purpose of section 1133 has been fulfilled[,]" with such purpose being "to afford the beneficiary an explanation of the denial of benefits that is adequate to ensure

meaningful review of that denial." *Wade*, 493 F.3d at 539 (internal citations omitted). This standard also "considers all communications between an administrator and plan participant to determine whether the information provided was sufficient under the circumstances." *Wade*, 493 F.3d at 539 (quoting *Moore v. LaFayette Life Ins. Co.*, 458 F.3d 416, 436 (6th Cir. 2006)). The phrase "all communications" has been construed to encompass oral communications as well as written ones. *Wade*, 493 F.3d at 539 (citing *White v. Aetna Life Ins. Co.,* 210 F.3d 412, 417 (D.C. Cir. 2000) (citing *Heller v. Fortis Benefits Ins. Co.*, 142 F.3d 487, 493 (D.C. Cir. 1998)).

Stated plainly, Section 1133 and its corresponding regulations demand that an employee benefit plan: "(1) provide adequate notice; (2) in writing; (3) setting forth the specific reasons for such denial; (4) written in a manner calculated to be understood by the participant; and (5) afford a reasonable opportunity for a full and fair review by the administrator." *Wade*, 493 F.3d at 540. "[C]ompliance with Section 1133 *at each and every level* of review of a Plan's internal claims processing" is simply not mandated as "[t]he end goal of judicial intervention in ERISA is not to correct problems at every level of plan administration, but to encourage resolution of the dispute at the administrator's level before judicial review." *Id.* (citing *Robinson v. Aetna Life Ins. Co.*, 443 F.3d 389, 393 (5th Cir. 2006) (emphasis in original)). "Substantial compliance requires 'meaningful dialogue' between the [participant] and administrator." *Lafleur v. Louisiana Health Service and Indem. Co.*, 563 F.3d 148, 154 (5th Cir. 2009) (citing *Wade*, 493 F.3d at 540).

Federal regulations promulgated pursuant to ERISA "provide insight into what constitutes full and fair review." *Lafleur*, 563 F.3d at 154. "The Department of Labor's regulations further elaborate on the "full and fair review" requirement of 29 U.S.C. § 1133(2)." *Sweatman*, 39 F.3d at 598 n.6 (citing 29 C.F.R. § 2560.503-1(g)(1) (1993)). Specifically, they provide that:

> Every plan shall establish and maintain a procedure by which a claimant or his duly authorized representative has a reasonable opportunity to appeal a denied claim to an appropriate named fiduciary or to a person designated by such fiduciary, and under which a full and fair review of the claim and its denial may be obtained.  Every such procedure shall include but not be limited to provisions that a claimant or his duly authorized representative may: (i) Request a review upon written application to the plan; (ii) Review pertinent documents; and (iii) Submit issues and comments in writing.

*Id.*

Berner argues that Guardian refused to review its initial decision and failed to provide a full and fair review of its initial adverse benefit determination by its refusal to review the specific grounds for its determination.[8]  Guardian, in contrast, asserts that there is no evidence in the administrative record to support Berner's contention that she was denied a full and fair review of her claim.  It also asserts that even if it failed to fulfill certain procedural requirements, Berner is not entitled to a substantive damage remedy.  The Court is of the opinion that Guardian provided adequate notice in writing to Berner setting forth the specific reasons for its denial and written in a manner calculated to be understood by her.  Hence, Guardian provided her with a meaningful review of its initial benefits denial decision on appeal.

Specifically, the administrative record reflects that on October 6, 2005, ClaimSource sent a letter to Berner advising her that her disability benefits were being discontinued because she no longer satisfied the policy's definition of "total disability."  The letter then provided Berner with an overview of the requirements for long-term disability benefits as well as an overview of her

---

[8] Berner also alleges that Guardian is now arguing, for the first time, that Berner's condition is excluded by a two-year "mental/nervous" clause in the Plan.  (Docket Entry No. 16 at 7; Docket Entry No. 24 at 4).  Berner insinuates that by way of this argument, Guardian "posits that such a limitation means that mental conditions can be ignored in the analysis of disability, *i.e.*, a sort of back door approach to basing its denial on such a clause, if any."  (Docket Entry No. 16 at 7.)  The Court finds Berner's argument in this regard lacks merit, as the record indicates that Berner first alleged that Guardian abused its discretion, in part, by not considering evidence of her cognitive functioning and limitations when it denied her claim for continuing disability benefits.  In response, Guardian directed her to the specials limitations provision contained in the Plan as an explanation for why her argument concerning her mental limitations also fails.

medical history from January 2003 to that date.   Next, the letter described the obstacles ClaimSource had encountered in attempting to collect medical records from her treating physicians in support her disability claim.   Further, the letter advised Berner that her claim file had been referred to an independent physician consultant for review and assessment.

The letter advised that upon his review, the physician consultant concluded that the "[medical] records indicate[d] that [Berner exhibited] an inherited neurodegenerative condition, Huntington's disease and Asthma.   However, the medical records did not substantiate any neurological deficits or physical impairments that preclude[d] the ability to perform all work . . . . The physician consultant stated that [Berner exhibited] the ability to perform light work."   The results of a physical capacities evaluation performed by him was also included in the letter setting forth Berner's residual abilities in an eight-hour workday.   Thereafter, the letter informed Berner that a copy of the physician consultant's review and assessment was sent to her treating physicians for review and comments.   It noted that:   (1) Dr. Amer Al-Karadshed, her endocrinologist, stated that he could not express any opinions in agreement or disagreement with the physician consultant's response; (2) Dr. Gascot, her general practitioner, had advised that he was not seeing Berner for any condition related to her disability; and (3) Dr. Ondo, her newly-treating neurologist, simply failed to respond to its requests, despite its repeated attempts to obtain such information.   The letter further provided an overview of a vocational assessment completed relative to Berner's condition, which determined that Berner was capable of engaging in gainful employment in positions requiring only sedentary exertion, such as that of a legal or social secretary or correspondence clerk.

Finally, the letter set forth a summary of its findings and notified Berner of her right to appeal the decision.   It expressly stated as follows:

**Appeal Rights:**

Should you wish to appeal this decision, you need to state your reasons for appeal in writing and provide us with objective evidence of disability that precludes you from working full-time in any occupation.

- A detailed narrative report outlining in objective terms the specific physical and/or mental limitations and restrictions based on examination findings;

- physician's prognosis including course of treatment, frequency of visits, specific medications prescribed and an estimated time frame for return to work;

- copies of diagnostic studies and/or mental status examinations and opticallogical studies;

- any documents or information specific to the condition(s) for which you are claiming total disability, and which would assist in the evaluation of your disability status; and

- any other information or documentation you believe may assist in reviewing your claims.

(Docket Entry No. 13, Ex. B at 000063).  It also provided that "[t]o obtain a review, [Berner] or [her] representative should submit a request in writing to ClaimSourceDM Appeal Unit addressed to the Quality Review Section, P.O. Box 5949, Buffalo Grove, IL 60089." *Id.*  It also advised Berner that she had a right to review documents pertinent to her claim.  *Id.*  It further stated that "[w]ritten request for review must be mailed or delivered within 180 days following receipt of [the explanation for denial]. *Id.*

Subsequently, on October 14, 2005, Berner wrote to ClaimSource requesting a temporary reinstatement of her benefits and a "delay [in its] premature decision" until Dr. Ondo had an opportunity to respond to ClaimSource's request for information.  (Docket Entry No. 13, Ex. B at 000213).  In her second letter to ClaimSource of that same date, she stated that she had spoken with "Faye" of Dr. Ondo's office and that Dr. Ondo had faxed a letter to ClaimSource on

September 12, 2005.  *Id.*  No such letter, however, appears as part of the administrative record before this Court.  Thereafter, over the next several months, numerous communications between Berner and ClaimSource were exchanged.

On February 2, 2006, ClaimSource wrote to Berner advising that it had not received any medical evidence from her or her physicians to review and further informed her that unless it received additional medical evidence in support of her disability by March 29, 2006, her claim would be closed.  (*Id.* at 000209).  Nine days prior to the March 29, 2006 deadline, Berner wrote to ClaimSource advising of her intent to appeal the decision to deny her long-term disability benefits and requesting a copy of the instructions on how to appeal the decision, a copy of the Plan in effect at the time of her initial claim approval, as well as a copy of any and all doctor's reports, records, forms, etc. that ClaimSource relied on in reaching the decision to deny her claim.  (*Id.* at 000207).  She further advised that her initial request for appeal was incomplete and that she would be forwarding additional information.  (*Id.* at 000208).  On March 23, 2006, she again wrote to ClaimSource thanking it for sending the instructions on how to appeal and requesting a copy of the Plan in effect at the time of her initial claim as well as an extension of the deadline within which to comply with its request for evidence in support of her appeal.  (*Id.* at 000191 - 192).  On March 28, 2006, Berner sent two letters to ClaimSource requesting that the deadline for submitting information relevant to her appeal be extended until April 17, 2006.  (*Id.* at 000193 – 196).  On April 3, 2006, ClaimSource acknowledged receipt of her letters dated March 28, 2006, and granted her an extension of the deadline until April 17, 2006.  (*Id.* at 000190).

On April 17, 2006, Berner faxed ClaimSource a letter dated April 2, 2006, asking for a further extension of the deadline within which to timely complete her appeal until June 22, 2006.

(*Id.* at 000183 - 187.)   Also, on April 17, 2006, Berner faxed a second letter to ClaimSource dated April 2, 2006.  In this letter she:  (1) notified it that the purpose of her letter was to appeal the initial denial of benefits decision; (2) provided a brief background concerning her medical history, employment and 1995 disability claim; (3) described the symptoms of Huntington's disease; (4) referenced an unattached draft of her statement as to why she is unable to work; (5) referenced statements of family and friends, which were also not included with the letter; (6) described an injury to her right foot in 1997; (7) described two neck injuries sustained in "the 80's"; (8) referenced a medical note from Edwin J. Taegel, M.D., F.A.C., dated April 4, 2006, which denoted that she exhibited pain in her left upper trapezious border and along her left scapula thoracic area and that X-rays indicated narrowing at C4-5 and C5-6 with arthritis of the epiphyses in the same areas; (9) discussed her asthma and allergies to many things, including mold, cats, dogs, and Johnson Grass; and (10) referenced an index of attachments, which were not forwarded with the letter, but were to be provided by her to ClaimSource by priority mail. Nevertheless, many of the claimed attachments do not appear as part of the administrative record before this Court nor is there evidence that Berner has offered to supplement the record to incorporate these materials.  (*Id.* at 000101 – 105; 000176 - 000182.)

By way of her second letter dated April 2, 2006, Berner denoted her specific disagreements with ClaimSource's denial letter dated October 6, 2005.   (*Id.* at 000176.) Primarily, she asserted that "Dr. Garb's records should be considered because Huntington's Disease is a physical medical condition that causes depression and therefor[e] not under the 24 month mental nervous maximum benefit provisions of 'The Plan.'"  She also asserted that "[such records] should be considered because Dr. Garb was working in tandem with Dr. Coscia (before he died) to manage [her] symptoms of HD.  Since there is no treatment or cure for HD, this was

considered as regular care and attendance of a physician." (*Id.*)  She further noted that "[t]he depression [she] experience[s] is caused by HD and as such should not be considered as an exclusion under the Plan's 24 month mental nervous maximum benefit period." (*Id.*)  To this end, she makes reference to a medical report from Dr. Joohi Shahad, which Guardian contends was not attached to the letter and does not appear as part of the administrative record before this Court. (*Id.*)

On April 18, 2006, ClaimSource wrote to Berner informing her that it was unable to grant her request for an extension until June 22, 2006, that it had not received any of the materials referenced in her letter of April 17, 2006, that her claim was "closed" and that she had exhausted all of her remedies.  (Docket Entry No. 13, Ex. B at 000100).  On April 21, 2006, Berner wrote to ClaimSource advising that she had received the letter dated April 18, 2006, stating that her claim was closed "because 'the evidence was not received  . . . by the end of the business day on April 17, 2006" and expressing frustration with the fact that it was requiring that her evidence be received by ClaimSource before the close of business on April 17.  (*Id.* at 000036 – 37.)  She further indicated that she had forwarded her appeal letter and supporting attachments by priority mail, postmarked April 17, 2006 and attached a copy of the receipt.  (*Id.*)  On the same date, ClaimSource acknowledged receipt of Berner's letter dated April 21, 2006, affirmed its decision not to permit an extension of the April 17, 2006 deadline and reiterated that her claim was closed and that she had exhausted all of her remedies.  (*Id.* at 000033.)

In light of the extensive dialogue between Berner and Guardian, and the extensions granted to Berner, the Court finds that Berner was provided with a "full and fair review" of her claims and that Guardian substantially complied with the procedural requirements of ERISA in reviewing her initial benefits denial.  An examination of all communications at all levels between

Berner and Guardian, by way of ClaimSource, establishes that a meaningful dialogue existed between Berner and Guardian.  Although the record establishes that Guardian never forwarded a "copy of the Plan in effect at the time of her initial claim approval" or a "copy of the doctor's reports, records, forms, etc. that it relied on" in reaching its decision to deny Berner's claim, there is no doubt that Berner was fully aware of the basis for Guardian's decision.  Moreover, Berner's claim was re-evaluated as evidenced by ClaimSource's letter to her dated October 20, 2005, as well as its subsequent statements to her that no new evidence in support of her disability had been presented.  (*See* Docket Entry No. 13, Ex. B at 000209 - 210, 000033 - 34, 000100). Accordingly, the Court finds that Guardian substantially complied with the procedural requirements of ERISA when it terminated Berner's disability benefits and its procedural violations constitute nothing more than "technical noncompliance."

## VI.   CONCLUSION

After reviewing the information contained in the administrative record and the summary judgment evidence, the Court finds that Guardian's decision is supported by substantial evidence in the record and that a rational connection exists between its conclusion that Berner was not "totally disabled" and the information on which it relied to support its conclusion.  Moreover, the Court concludes that Guardian provided Berner with a "full and fair review" of its denial of her claim.  Accordingly, Guardian's motion for summary judgment is GRANTED; Berner's motion to strike is DENIED; and Berner's motion for partial summary judgment is also DENIED.

It is so **ORDERED**.

SIGNED at Houston, Texas this 11th day of December, 2009.

_____
Kenneth M. Hoyt
United States District Judge